THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY A. HOUCK, individually and       :
as the Executor of the Estate of       :
Douglas C. Houck,                      :
                                       :   3:19-CV-275
                     Plaintiff,        :   (JUDGE MARIANI)
                                       :
        v.                             :
                                       :                    FILED
WLX, LLC,                              :                  SCRANTON
                                       :
                     Defendant.        :               MAR 1 0 2022
                                       :
                                       :        PER_____
                                                   DEPUTY CLERK

**MEMORANDUM OPINION**

I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff, Randy A. Houck, individually and as the Executor of the Estate of his father,

Douglas C. Houck, filed a six-count Complaint on February 15, 2019 in the above-captioned

action against Defendant WLX, LLC (hereinafter "WLX"), asserting Wrongful Death Action

and Survival Action claims based on theories of vicarious liability and negligence, arising from

Douglas Houck's death on November 27, 2017.  (Doc. 1).

Following the completion of discovery, Defendant WLX filed an Amended Motion for

Summary Judgment (Doc. 24) and supporting brief (Doc. 27).  Plaintiff thereafter filed a brief

in opposition to the motion (Doc. 32), to which Defendant filed a Reply brief (Doc. 33).

Defendant WLX's Amended Motion for Summary Judgment (Doc. 24) is now ripe for

decision.  For the reasons set forth below, the Court will deny the motion.

## II. STATEMENT OF UNDISPUTED FACTS

Defendant WLX has submitted a "Statement of Material Facts" (Doc. 24-9) as to which it submits that there is no genuine issue or dispute, and Plaintiff has submitted a Response to Defendant's Statement of Material Facts (Doc. 31-19), with the result being that the following facts have been admitted except as specifically noted.[1]

On November 27, 2017, the decedent, Douglas C. Houck, was driving his pick-up truck north on State Route 220 in Cherry Township, Sullivan County, Pennsylvania. (Doc. 24-9, ¶¶ 3, 5). While driving, Mr. Houck's pick-up truck left the roadway, went through small trees, went over a drainage ditch, and struck a guide wire from a utility pole. (Doc. 24-9, ¶ 4; Doc. 31-19, ¶ 4). At 3:31 p.m. that same day, Mr. Houck was pronounced dead. (Doc. 24-9, ¶ 5).

Pennsylvania State Police Trooper Jeffrey Price, who led the State Police investigation of the crash (Doc. 24-9, ¶ 14), testified that he had reviewed the surveillance footage of a resident, Theresa Adams, who lived approximately 1.2 miles from the accident

---

[1] In reciting the material facts, the Court cites to only the moving party's statement of fact when that fact is undisputed.

Here, with the exception of paragraph 1, which cites to Plaintiff's Complaint, no paragraph in Defendant's Statement of Material Facts includes a citation to the record to support the asserted undisputed fact. *See* M.D. Pa. Local Rule 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."). This Court will not scour the record to search for the support that the Defendant failed to cite. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 821 n.8 (3d Cir. 2012) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks omitted). Nonetheless, because Defendant's Amended Motion for Summary Judgment sets forth a number of the same factual assertions, and includes corresponding citations to the record, the Court will consider those factual assertions where properly supported in the motion itself.

and that he observed "the Houck vehicle" driving past that house at 3:02:26. (Dep. of Price, at 33-36). The police did not retain this residential surveillance video and it is not otherwise available. (Doc. 24-9, ¶ 21; Doc. 31-19, ¶ 21). On the same day, a video surveillance camera at Pump N Pantry, which is located on Route 220, north of the accident location, recorded approximately six tractor-trailers on State Route 220 in Cherry Township within less than 15 minutes of the time of the accident. (Dep. of Price, at 87, 90-94; see also, Doc. 24-9, ¶¶ 7, 22; Doc. 31-19, ¶¶ 7, 22; Doc. 24, ¶ 34).

Zachery Smith, who has a commercial driver's license, was driving one of the flatbed vehicles seen in the surveillance/security video(s). (Doc. 24-9, ¶¶ 8, 9). Approximately two months earlier, on October 1, 2017, Mr. Smith had signed a document entitled "WLX, LLC Independent Contractor Agreement", entering into a contract between himself, as a "contractor", and WLX, LLC, as the "carrier." (Doc. 24-2, Ex. A). The contract was also signed by Paula McGee, the safety manager for WLX, LLC. (Id.). Exhibit A of the contract assigns "Truck/Tractor" unit number 3543 to Mr. Smith. (Id.). Mr. Smith testified that he was driving tractor number 3543 on November 27, 2017. (Dep. of Smith, at 11-13).

Mr. Smith testified that on the day of the accident he left a truck stop in Penbrook, New York, where he had spent the night, at 6:45 a.m. He later unloaded in DePew, New York, then returned to Chemung, New York around 11:30 a.m., and left Chemung at approximately 2:15 p.m. and drove to Hanover Township, Pennsylvania, where he arrived at around 6:15 p.m. (Dep. of Smith, 19-23, 27-28; Doc. 24-9, ¶ 28; Doc. 31-19, ¶ 28). Mr.

3

Smith's driver log for the day of November 27, 2017, indicates that he drove 350 miles that day. (Dep. of Smith, at 20).

After Mr. Houck's vehicle was towed from the scene, a ratchet binder/winch[2] was recovered from the floor of his pick-up truck. (Doc. 24-9, ¶ 17). Mr. Houck's family members saw this ratchet binder/winch in the pick-up truck in the days following the accident when they went to the tow yard to recover Mr. Houck's personal items. (Doc. 24-9, ¶ 18; Doc. 31-19, ¶ 18). According to Plaintiff, upon observing the ratchet binder/winch, the family contacted the State Police. (Doc. 31-19, ¶¶ 18, 19). Trooper Price testified that he saw the winch under the rear passenger seat of the vehicle at the accident site, but did not "know what the item was until I had looked into it further." (Dep. of Price, at 24-25).

Trooper Jeffrey Price is not a certified accident reconstruction expert and the State Police accident reconstruction team did not participate in the investigation. (Doc. 24-9, ¶¶ 15, 16). Trooper Price never inspected the trailer at issue. (*Id.* at ¶ 25). Trooper Price also did not conduct any testing on the winch that was recovered from the decedent's vehicle. (*Id.* at ¶ 20).

In response to Defendant's assertion that "[t]here are no known witnesses to the alleged accident" (Doc. 24-9, ¶ 6), Plaintiff admits that "there are no individuals who witnessed the ratchet binder fall off the WLX, LLC trailer that Zachery Smith was hauling,

---

[2] The parties agree that "[t]hroughout discovery the 'ratchet binder' has also been described and referred to as a 'winch'". (Doc. 24, ¶ 7; Doc. 31, ¶ 7).

4

penetrate Douglas C. Houck's windshield, and then strike Houck in the face causing his traumatic and fatal injuries" (Doc. 31-19, ¶ 6).

In similar semi-responsive and inappropriately argumentative fashion, Plaintiff denies Defendant's statement of fact that "[n]o documents or testimony establishes that a winch was missing from a WLX vehicle, from a vehicle driven on behalf of WLX, or from the vehicle driven by Smith" (Doc. 24-9, ¶ 13), stating that "[t]here is no evidence to support the contention that no ratchet binders were missing and that all rail stops were in place" (Doc. 31-19, ¶ 13).  Plaintiff repeatedly further improperly denies a number of Defendant's similar statement of material facts, including that (1) "There are no documents or testimony that Michigan Hollow Repair[3] repaired or replaced a winch stop on the trailer which was attached to Smith's tractor on the date of the incident", (2) "There are no documents or testimony that WLX repaired or replaced a winch stop or track on the trailer which was attached to Smith's tractor on the date of the incident"; and (3) "There are no documents or testimony which establishes that a winch or winch stop was missing from the trailer that was attached to Smith's tractor on the date of the incident." (Doc. 24-9, ¶¶ 36-38).  Plaintiff's denials to each of these statements of material fact do not, in fact, present a denial of the statements themselves, but rather present other evidence which Plaintiff believes support his claim that the ratchet binder/winch which allegedly killed Mr. Houck came from the WLX

---

[3] Michigan Hollow Repair performs repairs and inspections for WLX, LLC, in the New York area. (Doc. 24-9, ¶ 33).

vehicle, despite the asserted absence of documents or testimony as set forth by Defendant. (*See* Doc. 31-19, ¶¶ 36-38).

No criminal charges were brought against Mr. Smith or WLX. (Doc. 24-9, ¶ 27; Dep. of Price, at 141).

### III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory

statements that a factual issue exists. *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

7

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Defendant's motion for summary judgment "denies liability for the incident and also denies that the ratchet binder at issue came from its trailer." (Doc. 24, at ¶ 10). Defendant claims that it is entitled to judgment in its favor "because there is no genuine issue of material fact that no evidence establishes that the winch at issue came from Defendant's vehicle." (Doc. 24, at ¶¶ 21-39; *see also*, *id*. at ¶¶ 40-54). Defendant further asserts that "there is no evidence in the record which establishes the requisite mental state for a viable claim for punitive damages." (Doc. 24, at ¶¶ 55-66).[4]

### A. Negligence

Defendant first asserts that Plaintiff cannot establish a *prima facie* case of negligence against WLX. Defendant argues that here, "to establish a *prima facie* case of negligence, Plaintiff must establish, at minimum, that the winch found in the decedent's

---

[4] Defendant's motion also asserts that it is entitled to judgment in its favor "because there is no genuine issue of material fact that Smith was an independent contractor at all times material to this case and therefore, WLX has no vicarious liability for Smith's torts". (Doc. 24, at ¶¶ 12-20). However, Defendant fails to address this argument in its supporting brief. Despite Plaintiff noting this deficiency (*see* Doc. 32, at 2), Defendant's Reply brief also does not address the assertion that Smith was an independent contractor. Thus, the Court deems this argument waived for purposes of adjudication on summary judgment. *See e.g.*, *Kushner v. Hendon Const., Inc.*, 81 F.R.D. 93, 95 (M.D.Pa. 1979), *aff'd*, 609 F.2d 501 (3d Cir. 1979) (where Plaintiffs' motion for new trial raised eight grounds for relief, but did not include four of those grounds in the "Questions Presented" section of their supporting brief, and did not otherwise address these four issues in the supporting brief, the four unbriefed issues set forth in the motion were deemed waived/withdrawn).

vehicle came from the WLX trailer and/or, under a theory of *res ipsa loquitor*, establish that other responsible causes, including the conduct of third persons, are sufficiently eliminated by evidence." (Doc. 27, at 8).

"Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009) (internal citations and quotation marks omitted).  Under Pennsylvania law, a plaintiff alleging negligence must establish the following elements: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage. *Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011). Whether a defendant is under a legal duty to conform to a reasonable standard of care is a question of law for the Court to decide, while the question of "whether there has been a neglect of such duty is generally for the jury." *Emerich*, 720 A.2d at 1044.

Defendant does not challenge the first or fourth element of the negligence claim for purposes of summary judgment, and only implicitly challenges the second element – breach of its duty to conform to a standard of conduct.  Rather, Defendant focuses on the causation element of the negligence claim and asserts that Plaintiff "has no direct evidence as to the cause of the accident" where there are no known witnesses to the accident, no person observed the winch come off the WLX trailer, no conditions were present on the trailer to suggest the winch may have come off the trailer, "[e]very person who examined the trailer,

9

both before and after the incident, confirmed that its winch stops were in place and would prevent a winch from coming off the trailer", and "no evidence connects the winch found in the decedent's vehicle to Smith's tractor-trailer." (Doc. 27, at 9).

"To satisfy the prima facie element of causation, the plaintiff must establish a causal connection between [the] defendant's conduct and the plaintiff's injury." *Midgette v. Wal-Mart Stores, Inc.*, 317 F.Supp.2d 550, 563 (E.D. Pa. 2004) (internal citation and quotation marks omitted). "It is the plaintiff's burden to prove that the harm suffered was caused, both factually and legally, by the defendant and that burden must be sustained by a preponderance of the evidence." *Polansky v. Vail Homes, Inc.*, 2016 WL 2643253, at *5 (W.D. Pa. 2016) (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978)).

It is well settled that, under Pennsylvania law, "the mere occurrence of an accident does not establish negligent conduct." *See Iavaroni v. Woodloch Pines Resort*, 2016 WL 796057, at *5 (M.D. Pa. 2016) (citing *Hillelson v. Renner*, 130 A.2d 212, 214 (Pa. Super. 1957)). Instead, the plaintiff must "prove causation by direct or circumstantial evidence." *Eisenberry v. Shaw Bros., LLC*, 2010 WL 235108, at *4 (M.D. Pa. 2010). Further, although "a party may prove its case with circumstantial evidence, 'there is a limit to the inferences that the jury may reasonably draw from such circumstantial evidence.' . . . Specifically, 'while the jury may draw reasonable inferences, it may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but ... there must be evidence upon which logically its conclusion may be based.'" *Cmty. Preschool & Nursery of E. Liberty, LLC v. Tri-*

State Realty, Inc., 430 F.App'x 125, 127 (3d Cir. 2011) (quoting Fitzpatrick v. Natter, 961

A.2d 1229, 1241, 1242 (Pa. 2008)).  See also, Fedorczyk v. Caribbean Cruise Lines, Ltd.,

82 F.3d 69, 74 (3d Cir. 1996) ("It is axiomatic that the mere showing of an accident causing

injuries is not sufficient from which to infer negligence.  Negligence is a fact which must be

proved; it will not be presumed.  The plaintiff must introduce evidence which provides a

reasonable basis for the conclusion that it was more likely than not that the negligent

conduct of the defendant was a cause in fact of the injury.") (internal quotation marks and

citations omitted); Churilla v. Barner, 409 A.2d 83, 85 (Pa. Super. Ct. 1979) ("The mere

happening of an accident or injury does not raise an inference or presumption of

negligence, nor even make out a prima facie case of negligence. . . . Rather, the plaintiff

must produce evidence to support his version of the incident . . . ; theories as to what may

have transpired in an automobile accident may not be employed as a substitute for such

evidence.") (internal citations omitted).

Defendant's assertion that it is entitled to summary judgment where Plaintiff has no

"direct evidence as to the cause of the accident" (Doc. 27, at 9) is unpersuasive where a

plaintiff may prevail based solely on circumstantial evidence, even in the absence of direct

evidence of causation.  See e.g., Fedorczyk, 82 F.3d at 74; Eisenberry, 2010 WL 235108, at

*4-5 (where plaintiff relied exclusively on circumstantial evidence, finding existence of

genuine issue of material fact as to whether defendants proximately caused plaintiff's

injury).  Although Plaintiff's case is largely, if not entirely, premised on circumstantial

evidence, the record evidence is sufficient at the summary judgment stage to create triable issues of fact which are not premised on mere speculation or conjecture, but rather provide a reasonable basis to allow a jury to make a determination as to whether Plaintiff has satisfied its burden of proof of establishing Defendant's alleged negligence. Such evidence includes, but is not limited to, the evidence set forth below.

Preliminarily, Defendant does not dispute that Mr. Houck died as a result of a winch/ratchet binder penetrating his vehicle's windshield and striking him in the head.[5] Thus, at issue in the present motion is only whether material disputes of fact exist as to causation, and specifically whether there is a triable issue as to whether the winch/ratchet binder, undisputedly recovered in Mr. Houck's vehicle after it was towed from the scene (*see* Doc. 24-9, ¶ 17), came from Defendant WLX's trailer.

On November 27, 2017, Zachery Smith was using trailer number 5212, the WLX trailer at issue in this case. (*See* Dep. of Smith, at 11-13, 33-34). Mr. Smith testified that at 12:30 p.m. on November 26, 2017, the day before the accident, he conducted a 15-minute pre-trip inspection in Tioga, Pennsylvania prior to driving to Chemung, New York. (Dep. of

---

[5] Defendant argues in its Reply brief that Mr. Houck's cause of death is "irrelevant to the present motion" because their motion is premised on the argument that Plaintiff cannot "meet his burden of establishing a *prima facie* case that the rachet binder found in decedent's pickup truck came from Defendant's trailer." (Doc. 33, at 1). The Court disagrees that the cause of death is irrelevant. However, if the cause of death is disputed, there is sufficient evidence in the record to create an issue of fact as to Mr. Houck's cause of death and to support a finding by the jury that Mr. Houck died as a result of a winch/ratchet binder penetrating his windshield while he was driving. (*See e.g.* Doc. 31-2 (Coroner's Report listing cause of death as "massive cranial trauma" and "motor vehicle accident" and identifying "truck tie down winch (bottom mount) or similar", recovered in the decedent's vehicle, as item "consistent with the decedent's head wound")).

Smith, at 15-17).  On the day of the accident, Mr. Smith testified that he left the truck stop in

Penbrook, at 6:45 a.m., unloaded in DePew, New York, returned to Chemung, New York

around 11:30 a.m., and left Chemung at approximately 2:15 p.m. and drove to Hanover

Township, Pennsylvania, where he arrived at around 6:15 p.m.  (Dep. of Smith, at 19-23,

27-28; Doc. 24-9, ¶ 28; Doc. 31-19, ¶ 28).

Mr. Smith stated that, in Chemung, he tied/secured "the load" from approximately

1:00-1:30 p.m. prior to leaving at 2:15 p.m.  (Dep. of Smith, at 26-27).  Mr. Smith admitted

he did not have a specific recollection of whether he stopped between Chemung and

Hanover Township, but he testified that he has "a habit of stopping to check securement"

within "a half hour to an hour" of the beginning of his trip.  (*Id*. at 30-31).  He would make a

note if anything needed to be replaced or fixed.  (*Id*. at 32).  Mr. Smith's driver log for

November 27 does not note whether he stopped to perform this safety inspection, and if he

did, that he discovered anything unsafe.  (*Id*. at 33).  Mr. Smith further testified that he looks

at every ratchet on a trailer before he leaves, but does not typically look at every locker pin,

which keep the reels from sliding off, on the sliding rail during his pre-trip inspections.  (Dep.

of Smith, at 50-51, 90-91).

Mr. Smith admitted that he has never had reason to count the number of ratchets on

a trailer because "every trailer is different" and as a consequence, he did not know how

many ratchets were on trailer 5212 when he left Chemung on November 27.  (*Id*. at 41, 43).

Mr. Smith acknowledged that "[t]here's usually a couple extra" ratchets on a trailer that are

not used.  (*Id.* at 88).  Similarly, Chris Johnson, an employee of Michigan Hollow Repair

("Michigan Hollow"), testified that there is no way to determine how many winches were on

trailer 5212 at any given time and that he had never counted the number of winches on that

trailer.  (Dep. of C. Johnson, at 36-37).  (*See also*, Dep. of J. Johnson, at 24-25, 36 (another

employee of Michigan Hollow stating that he does not know how many winches are on any

given trailer and that he has never counted winches)).

      Chris Johnson testified that he does work for WLX through the Michigan Hollow, a

repair shop for "[m]ostly fleet maintenance" of trucks and trailers for which he is the

foreman.  (Dep. of C. Johnson, at 5-6).  In reviewing Michigan Hollow's invoices for trailer

5212 from March 17, 2017 through June 7, 2019, Chris Johnson testified that no invoice

mentioned any type of repair or replacement of a rail stop, that there was no indication that

anyone at Michigan Hollow had done any work involving winch stops on trailer 5212, and

that he did not believe that he or any other person at Michigan Hollow has replaced a rail

stop on a trailer belonging to WLX.  (Dep. of C. Johnson, at 27-28, 47, 48).  Joshua

Johnson, another employee of Michigan Hollow, also testified that he has never had to

replace a winch or a rail stop.  (Dep. of J. Johnson, at 21, 24).

      According to the inspection sheet completed by Joshua Johnson on December 14,

2017, nothing on trailer 5212 needed repair and Joshua Johnson did not find anything

defective, unsafe, or missing.  (Dep. of J. Johnson, at 31, 40, 73, 76, 77).  In performing the

inspection, Joshua Johnson testified that this included making sure that "the w[i]nches are

all in", which he described as checking to make sure that the hooks and bolts are in.  (Dep. of J. Johnson, at 33-34, 59).  Joshua Johnson confirmed that "cotter pins" and bolts used in various rail stops are checked during his inspections of trailers, which were performed either every six months or once a year.  (Dep. of J. Johnson, at 21-23).  Nonetheless, despite Joshua Johnson's testimony and his review of the inspection sheet relating to his inspection of trailer 5212 on December 14, 2017, Joshua Johnson could not confirm that there were no issues relating to the trailer's winch or winch system at the time of his inspection.

> **Q.** . . . On December 11 and on December 14, 2017, when you looked at trailer 5212 on both of those days, did you see anything at all that indicated to you that the w[i]nches or the w[i]nch system, and I'm including the rails and the stops and everything that has to do with the w[i]nches, did you see anything at all that indicated to you that there was a problem with this and it was somehow unsafe or defective?
>
> **A.** I cannot say for certain, but from the work orders it does not seem like I did.
>
> **Q.** And if there was something, was that something you would have addressed in the work order?
>
> **A.** It was something I would have most likely fixed right there.

(Dep. of J. Johnson, at 79-80).

Both Chris Johnson and Joshua Johnson testified that they were unaware whether any repairs were performed on trailer 5212 between the time of the accident on November 27, 2017, and when Joshua Johnson saw the trailer on December 11, 2017.  (Dep. of J. Johnson, at 80; C. Johnson, at 64).

The testimony of Mr. Smith, Chris Johnson, and Joshua Johnson, provide an initial basis, although thin, to demonstrate the existence of factual disputes as to Defendant's assertion that there is no evidence that the winch recovered in Mr. Houck's vehicle fell from Mr. Smith's trailer.  Specifically, the testimony may allow a jury to reasonably infer that (1) one or more winches/ratchet binders on trailer 5212 were unused on the afternoon of November 27, 2017, when Mr. Smith was driving from Chemung to Hanover Township, and are unaccounted for; (2) Mr. Smith did not properly check and/or secure the load on November 27, 2017; and (3) that repairs by someone other than an employee of Michigan Hollow may have been done between November 27, 2017, and the date of Joshua Johnson's inspection of the trailer in December, 2017.

The testimony of Trooper Jeffrey Price, who led the State Police investigation of the crash, further demonstrates the existence of material factual disputes. Here, the parties do not dispute that the Trooper is not a certified accident reconstruction expert and that the State Police accident reconstruction team did not participate in the investigation.  (Doc. 24-9, ¶¶ 14, 15, 16).  It is further undisputed that Trooper Price never inspected the trailer at issue.  (*Id.* at ¶ 25).  However, despite these undisputed facts, Trooper Price offered several opinions/statements in his deposition which, particularly when viewed in conjunction with other record evidence, demonstrate the existence of triable issues of fact.

Although not a certified accident reconstructionist, Trooper Price testified that he has done accident investigations for approximately 20 years for the state police.  (Dep. of Price,

at 5-6). Trooper Price's "crash report" indicates that he was dispatched to the scene of the

Houck accident at 3:09 p.m. and arrived at 3:12 p.m. (*See Id.* at 7-8).[6]  Trooper Price listed

the "crash time" as 3:04 p.m. and testified that he determined this time having reviewed

video surveillance and made a "rough calculation of what time [Houck] would have arrived

at the crash scene." (*Id.* at 9).  Although the crash report lists one of the units involved in

the accident as a "phantom vehicle", Trooper Price later determined that the vehicle was

"the truck from WLX Trucking and the trailer hauling structural steel," driven by Mr. Smith.

(*Id.* at 14, 15).  Trooper Price explained he made this determination in the following manner:

> I had located an area where there was video surveillance and then I was able
> to check all the vehicles coming through around that frame of time when Mr.
> Houck went through and looked to any possibility of how any vehicles that
> would have had this type of trailer w[i]nch on it and was able to narrow it down
> to a specific truck that I had on video. I was able to look at what the truck was
> hauling, which was structural steel, and there's only so many places where that
> type of structural steel was made so I ended up inquiring -- I believe the industry
> was called Vulcraft and they make that type of structural steel. When I talked
> to them they had -- I asked them if they shipped out themselves or if they had
> other subcontractors shipping out and they said both. And I was trying to narrow
> down one of their trucks would have been leaving on that day, could have been
> coming through at that time. They indicated to me -- I gave 'em a description of
> the truck and they said, oh, a purple truck. That's got to be, you know, WLX
> Trucking and they forwarded me information to WLX Trucking and that's how I
> came to contact them and inquire. And they were very helpful initially as to, you
> know, narrowing down the truck coming through at that specific time, that
> specific area, providing me with information from the driver.

(*Id.* at 15-16).

---

[6] The principal road on which the accident took place, Route 220, is a state highway which has two
travel lanes and a speed limit of 55 MPH.  (Dep. of Price, at 11).

Trooper Price testified that he reviewed video surveillance footage from two sources: the residence of Theresa Adams and a Pump N Pantry.  He did so because he "wanted to know what vehicle could have passed through there that could have caused" the accident. (Dep. of Price, at 33).

Ms. Adams' residence is located approximately 1.2 miles from the scene of the accident.  (Dep. of Price, at 35).[7]  Trooper Price estimated that he reviewed approximately 5 minutes of Ms. Adams' home video surveillance prior to the accident and 5 minutes after the accident.  (*Id.*).  His report states that at 3:02:26 p.m. he saw Mr. Houck's Dodge Dakota pick-up truck on the video pass by Ms. Adams' home, traveling north on Route 220 at approximately 55 MPH.  (*Id.* at 35, 36).  Trooper Price testified that his report states that the following vehicles were then seen on the video surveillance:

- 3:04 p.m.: silver car traveling south;

- 3:04 p.m.: red Jeep traveling south;

- 3:04:53 p.m.: white truck with blue trailer traveling south hauling a CertainTeed trailer;

- 3:04:54 p.m.: purple tractor-trailer hauling metal joists on a step deck trailer traveling south;

- 3:05:09: white F-150 pick-up truck traveling south;

- 3:05:25: gray Ford Escape.

---

[7]  Trooper Price estimated that the distance between the residence and the sight of the accident was approximately 1.2 miles.  Plaintiff's expert, Mr. Lynch, stated that an "independent evaluation of the evidence and available data establishes the distance was approximately 1.33 miles. . ." (Doc. 31-10, at 7).

(Dep. of Price, at 37-38).[8]  The driver of the Ford Escape informed Trooper Price that the accident had already occurred when she passed through the area.  (*Id.* at 38).  According to Trooper Price, the purple tractor trailer seen at 3:04:54 p.m. was later determined to be Mr. Smith's vehicle.  (*See e.g., id.* at 57-59).  This tractor-trailer did not have the same type of winches as the white truck with the blue trailer which passed by one second earlier.  (Dep. of Price, at 37; *see also, id.* at 146 (CertainTeed trailer did not appear to have winches)).  In reviewing the Adams' residence surveillance video, Trooper Price testified that he did not see any other vehicle that had ratchet binders, other than the WLX trailer, which could have been at the scene of the accident.  (*Id.* at 45).

Trooper Price also set forth what he viewed on the Pump N Pantry surveillance video:

- 2:46:46 p.m.: flatbed tractor-trailer traveling north;

- 2:55:39 or 2:57:53 p.m.: dark blue CertainTeed tractor-trailer traveling south with a flatbed trailer[9];

- 2:48:45 p.m.: purple flatbed;

- 2:58 p.m.: purple tractor-trailer traveling south, later identified as the WLX trailer;

- 2:59:59 p.m.: tractor-trailer with a flatbed traveling south;

---

[8] Trooper Price acknowledged that a yellow cab flatbed was also seen in the surveillance footage approximately 2 or 2.5 minutes prior to the accident, but did not deem this relevant to his investigation. (Dep. of Price, at 84-85). He admitted that this flatbed vehicle had "a couple" winches. (*Id.* at 85).

[9] Because of the manner in which counsel posed questions during the depositions, and their failure to include the exhibits or documents to which the witness was referring in answering the questions, it is often difficult to discern to what a witness is referring during that witness' deposition testimony. This includes the time at which the CertainTeed tractor-trailer appears on the Pump N Pantry surveillance video. (*See* Dep. of Price, at 91).

- 3:03:10 p.m.: rollover truck traveling north.

(Dep. of Price, at 47, 90-92).  Trooper Price admitted that several of these vehicles may have had winches on them.  (*Id.* at 92-93, 94).  Trooper Price did not investigate the origin or destination of any tractor-trailer other than the WLX trailer.  (*Id.* at 95).

Trooper Price estimated Mr. Houck was traveling at approximately 55 MPH at the time of the accident "based on the distance that the vehicle traveled after impact with the trailer w[i]nch, the damage to the vehicle and also just from the clip of actual watching the vehicle go by at a different location."  (Dep. of Price, at 18-19; *see also*, *id.* at 97).  Trooper Price further based this estimate "on 20 years of running radar and watching vehicles go by."  (*Id.* at 82).

On December 2, 2017, Trooper Price located approximately 6 gouge marks on Route 220, which he stated were from a WLX style trailer winch.  (Dep. of Price, at 47, 48).  He determined that the marks were from the trailer winch which was found in Mr. Houck's vehicle because "they were the only marks in the roadway in that area, and . . . there's one specific gouge where you could actually see the shape of the ratchet teeth" and further that when he looked at the trailer winch "there were scrapes on the trailer w[i]nch itself" consistent with an impact with pavement.  (*Id.* at 48).  According to Trooper Price, most of the gouges were located in the southbound lane of Route 220, but the final gouge was in the northbound lane.  (*Id.* at 65).  However, he did not find any gouge marks in the lane where Mr. Houck's vehicle was located.  (*Id.* at 105).

In summary, Trooper Price opined that the accident involving Mr. Houck occurred in

the following manner:

> Basically the WLX truck was traveling southbound. Mr. Houck's vehicle was
> traveling northbound. The ratchet fell off of the WLX truck, bounced down the
> road. After the last bounce it bounced up high enough to impact Mr. Houck's
> vehicle. He was -- he was killed by the ratchet that came through the windshield
> and the vehicle continued and veered off the road until final rest.

(Dep. of Price, at 68).  Trooper Price testified that he "did not have any evidence that it [the

ratchet/winch] could have come from another vehicle, no." (Dep. of Price, at 68-69).

Paula McGee, the safety manager of WLX since 2015, testified that after being

informed that "an officer had called and wanted to try to see if one of our trucks had been in

a particular area," she looked at GPS tracking for WLX trucks.  (Dep. of McGee, at 6, 14,

17-18).  Specifically, Ms. McGee "logged into [WLX's] ELD system, pulled up the truck

number" and found that the truck "was in the area of the time that was in question." (Id. at

18-19).  A document from this system indicates that Mr. Smith's vehicle was "'[d]riving 63

miles per hour on 11/27/2017 at 14:04:54.'" (Id. at 19-20).

Trooper Price's testimony, in conjunction with Ms. McGee and Mr. Smith's testimony,

create triable issues of fact as to the exact location and speed of Mr. Smith's vehicle and

Mr. Houck's vehicle, as well as whether there were other vehicles in the area which may

have been the source of the winch.  The above-cited testimony and record evidence, as well

as other testimony and evidence in the record, could reasonably lead a jury to find that Mr.

Smith's vehicle and Mr. Houck's vehicle were in close proximity to each other immediately

prior to the time of the accident, and that, despite the undisputed evidence that there were other trucks/vehicles in the area which had winches/ratchet binders, those vehicles were not in the immediate area sufficiently close to the time the accident occurred so as to be the source of the winch at issue.  It is also for a jury to determine whether the grooves found by Trooper Price on Route 220 were caused by a winch falling off a trailer on November 27, 2017, and can further be attributed to the winch recovered in Mr. Houck's vehicle.

Although Defendant contends that Plaintiff's reliance on various surveillance tapes and the testimony of Trooper Price to establish the timing of where Mr. Houck and Mr. Smith's vehicles were at the time of the accident is unreliable and speculative, the evidence assailed by Defendant presents genuine and material factual disputes.  The weight of the evidence which Plaintiff intends to present to support his factual assertions as to the locations and speeds of the vehicles at issue is for the jury to assign and is properly subject to thorough cross-examination at trial.  Further, Defendant's arguments that the surveillance video(s) cannot be authenticated and are inadmissible because they are incomplete, unreliable and/or inaccurate (see Doc. 33, at 5-6) are premature.  Similarly, Defendant's assertion that Trooper Price's "testimony regarding speed estimates from the video is pure speculation" (Doc. 33, at 7) is better resolved until the time of trial.

The record evidence further supports a finding that the winch found in Mr. Houck's vehicle was the same type as those winches located on Mr. Smith's trailer on the day of the accident.  In support of Plaintiff's opposition to the motion for summary judgment, Plaintiff

submitted the report of Scott Turner, a self-described "Commercial Motor Vehicle expert".

(Doc. 31-8; *id*. at 32).  Mr. Scott's report opines that "the cargo securement devices are an

exact match", specifically, "the cargo securement device [on the WLX semi-trailer inspected

by Scott] reveals a 5500# working Load Limit (WLL) capacity" and the cargo securement

device in PSP custody, found in Mr. Houck's truck, also "has a 5500# WLL and bears the

same WLL imprint. . ." (*Id*. at 22-23).[10]  Defendant's expert, Robert Nocivelli, similarly found

that the "subject WLX trailer . . . employed fourteen (14) Double-L winches" and that a

"Double-L winch was found on the floor behind the front seat of the subject 2002 Dodge

Dakota pickup truck." (Doc. 27-2, at 3, 5).  (*See also*, Dep. of Price, at 24-25 (confirming

that the deputy coroner located double L type trailer winch under the passenger seat of Mr.

Houck's vehicle)).

Mr. Nocivielli's report asserting that "[t]his style Double-L winch can be found in use

on numerous other common flat and multiple deck trailers" (Doc. 27-2, at 5) does not

eliminate the issue of whether the winch at issue came from the WLX's trailer, but only

demonstrates that an issue exists as to the origin of the winch.  As set forth, *supra*, Trooper

Price testified that although several of the vehicles he saw in the Pump N Pantry

surveillance video most likely had winches on them, having conducted his investigation, he

did not believe that the winch could have come from another vehicle.

---

[10] Mr. Scott's report explains that the term "cargo securement ratchet binder device" is in reference to what has otherwise been termed as a winch or ratchet binder.  (Doc. 31-8, at 3).

Plaintiff also submitted the expert report of Robert T. Lynch, P.E. which relies on the deposition testimony of several individuals, including Trooper Price, Ms. McGee, Chris and Joshua Johnson, as well as other documentary evidence. (*See* Doc. 31-10).  Mr. Lynch's expert report sets forth a number of statements in the sections entitled "Engineering Analysis" and "Opinions" that demonstrate the existence of triable disputes of fact, including but not limited to the following:

- "Engineering Analysis" (Doc. 31-10, at 6-8):

  o "Under the assumption that the WLX tractor-trailer maintained this speed [63 MPH] as it traveled from the area of the occurrence to the Adams residence, the WLX tractor-trailer would have been located in the area where the incident occurred approximately 76 seconds prior to passing the Adams residence.  The Houck Dodge would have traveled the same distance in approximately 82 seconds . . . for an average speed of approximately 58 miles per hour." (*Id.* at ¶ 5).

  o "The analysis of the available evidence and data indicates that the WLX tractor-trailer was in the same location of the Dodge at the time that the incident occurred." (*Id.* at ¶ 6).

  o "[T]he laws of physics support" a finding that a ratchet falling from a WLX trailer can bounce "to the height of the damage observed on the windshield of the Dodge." (*Id.* at ¶ 8).

  o "Specification data for the 2002 Dodge Dakota operated by Mr. Houck indicate that the height from the ground to the base of the windshield was approximately 4 feet.  The hole in the windshield is above the height of the base of the windshield, and so it was estimated that the ratchet that penetrated the windshield and killed Mr. Houck reached a height of 5 feet above the ground." (*Id.* at ¶ 9).

  o "The initial energy of the ratchet as it fell from the trailer is proportional to the square of the speed of the tractor-trailer.  With the tractor-trailer traveling at approximately 63 miles per hour and the height of the puncture hole at

approximately 5 feet above the ground, it was determined that less than 5% of the initial energy of the ratchet was required to allow for the ratchet to reach the height of the puncture hole after bouncing along the roadway. . . The available data indicates that the energy of the falling ratchet from the WLX tractor-trailer was sufficient to bounce along the roadway and then up to the height of the windshield of the Dodge, resulting in Mr. Houck's fatal injuries." (*Id*. at ¶ 11).

- "Opinions" (Doc. 31-10, at 8-9):

    o "There is no evidence or data to indicate that the ratchet mechanism came from any other vehicle/trailer than the WLX trailer." (*Id*. at ¶ 5).

    o "The laws of physics support that the ratchet while falling from the height of the trailer and bouncing along the roadway can, in fact, reach a height consistent with the height of the puncture hole in the windshield." (*Id*. at ¶ 7).

    o "The ratchet mechanism that penetrated the windshield of the Dodge, striking and killing Mr. Houck, came from the WLX trailer operated by Zachary Smith at the time of the incident." (*Id*. at ¶ 8).

Mr. Lynch's report, including the above-quoted statements therein, operate to further support a finding that the record contains evidence which create material factual disputes as to the causation of the accident.

Viewing the evidence in the light most favorable to Plaintiff, it is apparent that Plaintiff has presented sufficient evidence as to the possible origins of the winch/ratchet binder found in Mr. Houck's vehicle, and specifically, to raise the issue of whether the winch/ratchet binder fell off of Mr. Smith's trailer, above the level of speculation.

Finally, the Court notes that Defendant repeatedly asserts that Plaintiff's theory of the accident is based on "factually unsupported speculation." (*See e.g.*, Doc. 33, at 2). In particular, much of Defendant's Reply brief cites to the testimony and/or purported facts

originating from Trooper Price as being too speculative or unreliable or contradicting other evidence of record. (*See id.*, at 2-11).  However, as experienced counsel is well-aware, the credibility of the witnesses, including Trooper Price, is for the jury and this Court cannot make credibility determination or engage in weighing the evidence.  *See Anderson*, 477 U.S. at 255 ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence.").  To the extent that Defendant believes certain testimony or evidence is unsupported by the record or conflicts with other evidence in the record, this is properly subject to cross-examination at trial.

Defendant separately also argues that Plaintiff may attempt to rely on the doctrine of *res ipsa loquitor* to prevail in this action.  (Doc. 27, at 11-16).

"Circumstantial evidence when used to prove negligence must be distinguished from the doctrine of *res ipsa loquitur*.  The doctrine of *res ipsa loquitur* combines circumstantial evidence with a presumption on the burden of proof." *Fedorczyk*, 82 F.3d at 74.  The doctrine provides that "in certain cases the circumstantial evidence is sufficient for negligence to be presumed, and the burden of proof shifts to the defendant to rebut some element of the case." *Id.*  However, application of *res ipsa loquitur* "must be carefully limited." *Simpson v. Fed. Bureau of Prisons*, 2005 WL 2387631, *6 (M.D. Pa. 2005).

The Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts § 328D titled Res Ipsa Loquitur, as the law of the Commonwealth.  *See Gilbert v. Korvette,*

*Inc.*, 327 A.2d 94 (Pa. 1974); *Jones v. Harrisburg Polyclinic Hosp.*, 496 Pa. 465, 470 (Pa.

1981).  Section 328D provides as follows:

> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence
> of the defendant when
>> (a) the event is of a kind which ordinarily does not occur in the absence of
>> negligence;
>> (b) other responsible causes, including the conduct of the plaintiff and third
>> persons, are sufficiently eliminated by the evidence; and
>> (c) the indicated negligence is within the scope of the defendant's duty to
>> the plaintiff.
>
> (2) It is the function of the court to determine whether the inference may
> reasonably be drawn by the jury, or whether it must necessarily be drawn.
>
> (3) It is the function of the jury to determine whether the inference is to be drawn
> in any case where different conclusions may reasonably be reached.

Restatement (Second) of Torts § 328D (1965).

Here, Defendant does not challenge that Plaintiff may be able to establish that the

event is of a kind which ordinarily does not occur in the absence of negligence and that the

indicated negligence is within the scope of the defendant's duty to the plaintiff.  Rather,

Defendant argues that Plaintiff cannot meet the second element in section (1), i.e. that other

responsible causes, including the conduct of the plaintiff and third persons, are sufficiently

eliminated by the evidence.  (Doc. 27, at 12).  Specifically, Defendant asserts that "the

evidence does not sufficiently eliminate other responsible causes, specifically the seven

other flatbed vehicles known to be in the area of the accident at or about the time of the

accident", that the evidence does not "support the claim that the winch found in decedent's

vehicle bounced in the road and then struck his windshield" and that Plaintiff "failed to rule out other ways in which the accident may have occurred." (Doc. 27, at 12-15).

Defendant's arguments in support of its assertion that Plaintiff has not sufficiently excluded other responsible causes of Mr. Houck's death misrepresent what must be shown at the summary judgment stage, i.e., whether there is sufficient evidence that the inference "that harm suffered by the plaintiff is caused by negligence of the defendant . . . may reasonably be drawn by the jury." Restatement (Second) of Torts § 328D(1)-(2). In determining whether the inference may reasonably be drawn, the Court looks to whether there is sufficient evidence to find that this is a case where "different conclusions may reasonably be reached." *Id.* at § 328D(3).

As explained in the Commentary to Restatement (Second) of Torts § 328D,

> It is never enough for the plaintiff to prove that he was injured by the negligence of some person unidentified. It is still necessary to make the negligence point to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where there is no doubt that it is at least equally probable that the negligence was that of a third person, the court must direct the jury that the plaintiff has not proved his case. Again, however, the plaintiff is not required to exclude all other possible conclusions beyond a reasonable doubt, and it is enough that he makes out a case from which the jury may reasonably conclude that the negligence was, more probably than not, that of the defendant.

Restatement (Second) of Torts § 328D, cmt. f.

With its arguments in support of summary judgment, Defendant asks this Court to ignore the numerous factual disputes identified by this Court and to weigh the strength of Plaintiff's evidence, but it is not for the Court to make credibility determinations or assign

weight to the evidence, it is for the jury.  Considered in the proper legal context, the

testimony and record evidence set forth throughout this memorandum opinion, *supra*, is

sufficient to prohibit a determination at this stage of the proceedings that Plaintiff will be

unable, as a matter of law, to put forward evidence at trial that would allow the Court to

submit the question of negligence under the doctrine of *res ipsa loquitor* to the jury.

Furthermore, Defendant's assumption, to which Plaintiff does not directly respond,

that Plaintiff "may attempt to argue that the circumstantial evidence meets his burden of

proof under the doctrine of *res ipsa loquitor*" (Doc. 27, at 11) (underline added) presents a

premature argument.  The Court must await the presentation of evidence at trial prior to

determining whether Plaintiff is attempting to proceed using this doctrine, is entitled to do

so, and is entitled to a jury instruction on this doctrine.

For the foregoing reasons, Plaintiff has presented sufficient evidence to rebut

Defendant's assertion that "there is no genuine issue of material fact that no evidence

establishes that the winch at issue came from Defendant's vehicle" (*see* Doc. 24, at 4) and

WLX's motion for summary judgment as to Plaintiff's claims of negligence will thus be denied.

### B. Punitive Damages

Defendant further argues that the evidence in this case "does not support a claim for

punitive damages."  (*See* Doc. 27, at 16-19).

In Pennsylvania, punitive damages "are awarded only for outrageous conduct, that

is, for acts done with a bad motive or with a reckless indifference to the interests of others."

*SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991) (quoting *Chambers v. Montgomery*, 192 A.2d 355, 358 (1963)).  *See also Feld v. Merriam*, 485 A.2d 742, 747-748 (Pa. 1984):

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Punitive damages must be based on conduct which is "malicious," "wanton," "reckless," "willful," or "oppressive."  Further, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.  The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious. (Internal citations omitted).

As such, punitive damages "are not justified where the defendant's mental state rises to no more than gross negligence." *SHV Coal*, 587 A.2d at 705.  Further, to succeed on a claim for punitive damages, a plaintiff must produce sufficient evidence to establish that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).

Given that "Pennsylvania cases have adopted a very strict interpretation of 'reckless indifference to the rights of others,'" *Burke v. Maassen*, 904 F.2d 178, 181 (3d Cir. 1990), and that "punitive damages are an 'extreme remedy' available in only the most exceptional matters," *Phillips v. Cricket Lighters,* 883 A.2d 439, 445 (Pa. 2005), Plaintiff has a heavy burden to defeat Defendant's motion for summary judgment on the issue of punitive damages.

In support of its motion, Defendant argues that

In the case at bar, no evidence supports the claim that WLX, or anyone for whom it may be deemed vicariously liable, had a subjective appreciation of the risk of harm to the decedent or that they acted, failed to act, in conscious disregard of a known risk.  No evidence shows that Smith, or the individual or individuals who performed maintenance or repairs on the step-deck flatbed trailer hauled by Zachary Smith on November 27, 2017, or "employees, agents, apparent agents, servants, and/or officers, ostensible or otherwise" had actual or constructive knowledge "of facts which create a high degree of risk of physical harm to another" or that anyone deliberately proceeded to act, or to fail to act, in conscious disregard of, or indifference to, that risk."

(Doc. 27, at 18-19).

In light of this Court's memorandum opinion outlining the issues of fact that preclude summary judgment, the Court will deny Defendant's motion for summary judgment with respect to Plaintiff's claim for punitive damages, without prejudice.  Here, the Court has identified numerous disputes of material fact in connection with Defendant's motion for summary judgment as to liability which necessarily require resolution for any determination of whether Defendant's conduct may be deemed to not only have been negligent, but also to have been engaged in with an intentional, reckless or malicious state of mind.  It is for this reason that summary judgment on the issue of punitive damages may not be granted at this time.  The issue may be appropriately revisited at the close of Plaintiff's evidence at trial in accordance with Fed. R. Civ. P. 50(a).

## V. CONCLUSION

For the foregoing reasons, this Court will deny Defendant WLX's Amended Motion for Summary Judgment (Doc. 24).  A separate Order follows.

Robert D. Mariani
United States District Judge